# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 18, 2010

## STATE OF TENNESSEE v. WILLIAM KEITH BLACKBURN

**Direct Appeal from the Circuit Court for Lawrence County**
**No. 26007     Robert L. Jones, Judge**

————————

**No. M2009-01140-CCA-R3-CD - Filed July 20, 2011**

————————

A Lawrence County Circuit Court Jury convicted the appellant, William Keith Blackburn, of first degree premeditated murder and especially aggravated robbery. The trial court imposed an effective life sentence. On appeal, the appellant raises the following issues for review:

> 1. Whether the evidence is sufficient to support the appellant's convictions;
>
> 2. Whether the trial court erred in refusing to grant a mistrial after a detective testified that the appellant exercised his right to remain silent and refused to give police a statement;
>
> 3. Whether the trial court erred in admitting, or in the alternative not redacting, an audio tape recording of telephone calls the appellant made while in jail;
>
> 4. Whether the trial court erred by instructing the jury on flight and attempting to conceal or suppress evidence;
>
> 5. Whether the court reporter's failure to provide a complete transcript denied the appellant a full and complete appellate review; and
>
> 6. Whether the cumulative errors require a new trial.

Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. DAVID H. WELLES, Sp.J., not participating.

Claudia S. Jack (on appeal) and Shipp R. Weems (at trial and on appeal), Columbia, Tennessee, for the appellant, William Keith Blackburn.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Doug Dicus, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The appellant was charged with the first degree premeditated murder and especially aggravated robbery of the victim, William Evon Strickland.[1] The proof at trial revealed that on June 9, 2006, the victim and his son, Heath, planned to drive from Waynesboro to Spring Hill to pick up the victim's youngest son, Cody, who was living at the Tennessee Children's Home. Before leaving Waynesboro, the victim and Heath drove to the bank, the victim withdrew fifty dollars from his account, and the victim placed the money in his wallet. At trial, Heath testified that his father also had some old two-dollar bills, old coins, his driver's license, a social security card, a TennCare card, and his food stamp card with him.

The two men left Waynesboro on Highway 64, traveling toward Lawrenceburg. Heath testified that he rode with the victim because the victim did not like to travel alone. Shortly after entering Lawrence County, a rear tire on the victim's maroon and tan Chevrolet van "blew out." The victim drove to the side of the highway, parked the van, and the two men got out to change the tire. However, when they got the jack out of the van, they discovered they did not have a lug wrench they needed. The men sat on the side of the highway for approximately thirty-five minutes before another car stopped. Inside the car were Chris Hammack, Carrie Battles, and the appellant. After inquiring if the men needed help, Hammack, Battles, and the appellant got out of the car. Heath had never met the appellant before that day. When the appellant got out of the car, Heath noticed that he was wearing blue jeans but was not wearing a shirt. Heath said that the appellant acted "like he might have been up for a few days. Like he was drugged up."

---

[1] Some of the witnesses in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

Hammack offered to look in his trunk and see if he had a lug wrench they could use. He and Battles looked in the trunk and discovered that they did not have the wrench. Therefore, Hammack offered to drive the victim and Heath to Self's Market, which was approximately a mile and a half away, to borrow one. Heath agreed and offered to give them three dollars for the ride. The victim decided to stay and watch the van, and the appellant said that he would stay with the victim to keep him company.

Heath said that he, Hammack, and Battles went to the market. After borrowing a lug wrench and getting gasoline, they returned to the van. They were gone for approximately twenty minutes. When they returned, Heath did not see the victim. The appellant was approximately thirty-five yards from the van, walking in a circle, looking at the ground, and sweating profusely. Heath acknowledged that the day was hot, but he stated that he was not sweating as much as the appellant. He said that the appellant did not look happy but that he did not see any blood on the appellant.

Heath asked the appellant about the victim, and the appellant said that the victim had flagged down a white car and "headed toward Waynesboro." The appellant said that the victim left instructions for Heath to wait at the van until he returned. Heath said that while he worked on the tire, Hammack and Battles talked to him and tried to help. The appellant remained about fifteen feet away. They had been back for approximately twenty-five to thirty minutes when a Lawrence County Sheriff's Department patrol car drove by. Upon seeing the patrol car, the appellant told Hammack and Battles, "We need to go. I want to get out of here." At that point, Hammack, Battles, and the appellant left.

Heath said that he changed the tire and continued to wait for the victim. After approximately thirty minutes, he drove to the market to return the wrench before the store closed. He then returned to the scene and waited for the victim. Around 8:30 or 9:00 p.m., he called the victim's girlfriend, Doris Patterson, to see if the victim had returned home. Following his conversation with Patterson, Heath went home. The victim had not returned.

The following morning, Heath, Cody, and the victim's son, Anthony, went to the scene on Highway 64 where the victim was last seen. The three brothers walked in different directions, looking for the victim. While Heath searched near the median, Cody walked along the side of the road where the van had been parked. Heath said that near the area where Cody was walking was a barbed wire fence. Across the fence was a small group of trees and a brush pile. Heath said "[t]here was another fence just before the brush pile and it was pretty much an empty field. It had tall grass." Cody followed a path "through the grass where someone had traveled toward the fence." Just across the fence, Cody found a blue hat that was identical to the victim's hat. Cody continued looking and found the victim's body in the brush pile. Heath testified that the victim was "cool to the touch," his

body was stiff, and his wallet appeared to be missing. Heath waited with his father's body while Anthony and Cody left to call 911.

Carrie Battles testified that in June 2006, she was living with Hammack in Waynesboro. Around 10:00 a.m. on the morning of June 9, the appellant came to their home. Later, the three left the house to drive to a recycling center where they planned to sell some cans. Hammack was driving, the appellant was in the passenger seat, and Battles was in the back seat. Battles said that the appellant was acting "messed up." She explained that the appellant was drowsy, his head was down, and he said very little. Battles said that the appellant had been that way all day.

Battles said that as they were driving to the recycling center, they passed Heath and the victim who were on the side of the road. Hammack and Battles knew Heath, so they stopped to help. Hammack did not have a wrench, so he, Battles, and Heath drove to Self's Market. The appellant stayed with the victim. When they returned, the appellant was in the "middle of the four lanes." Battles said that the appellant "was drenched in sweat, like he just got out of the shower," and he was "[p]anting for air." Battles did not see the victim. She heard the appellant tell Heath that the victim had "flagged a white car down and was going back toward Waynesboro." Shortly afterward, the appellant walked to the car, grabbed a blanket from the back seat, and used it to wipe himself "from the chin, all the way down." Battles identified the blanket at trial.

Battles said that while they were trying to get the tire off of the car, they realized that a lug nut had been stripped and that they could not get the tire off. Battles, Hammack and the appellant returned home. Battles said that as they approached Hammack's residence, they saw the cover on the window move. The appellant asked Hammack if his father was there, and Hammack replied that he was. The appellant asked, "[W]ill he call the law?" Hammack said yes, and the appellant told Hammack to take him to Adrianne Rich's residence. Battles explained that Hammack's father lived close by and that he had on previous occasions "called the law" when there were a lot of people at Hammack's residence.

Battles said that the following morning, Heath, Cody, and Anthony came to her home. They asked if she had seen or heard from the victim. Battles told the men that she had not seen him. That night, officers from the Lawrence County Sheriff's Department came to Hammack's residence. Battles and Hammack were transported to the Lawrence County Jail where they were interviewed. As they were being driven home, Battles remembered that the appellant had used the blanket to wipe himself. Battles told the officers about the blanket, and they took it from her car. Battles acknowledged that she never noticed any blood on the appellant.

-4-

Chris Hammack testified that on the morning of the offense, the appellant came to the home he shared with Battles. Hammack said that the appellant "did not seem like hisself that day" and that he acted as if he were on drugs. Hammack said that he and the appellant discussed money and that they "were both about broke." Hammack said that he, Battles, and the appellant got into the car to drive to Lawrenceburg. After they got into Lawrence County, they saw a van with a flat tire on the side of the road. When he recognized Heath, Hammack stopped to help. Hammack did not have a tool they needed to change the tire, so he offered to drive to Self's Market to get one. Battles and Heath went to the market with Hammack.

Cody Strickland testified that on June 9, 2006, he was living at the Tennessee Children's Home in Spring Hill. Cody had a weekend pass, and the victim was scheduled to drive him home to Waynesboro. However, the victim never came. On June 10, Laranda Morrow, Anthony's fiancee, picked him up around 5:30 a.m. and drove him home. Later that day, he and his brothers went to the scene and searched for the victim. Cody said that he saw a blue hat between a fence and a brush pile. He walked to the brush pile and saw a person in the brush pile he recognized as the victim. Cody "touched his leg to see if he was still alive and he wasn't." He also touched the victim's back pocket to see if his wallet was still there, but the pocket was empty. Nearby, he saw a cigarette lighter and noticed hair in the fence. He walked back and told his brothers that he had found the victim.

Detective Donnie Ferguson testified that he was called to the scene on the afternoon of June 10, 2006, after the victim's body was found. He stated that there were two fences between the road and the victim's body. He explained that the first fence was "up a little bank[,] a little rise with a right of way on the highway." He stated:

> From the first fence back to the second fence, it's more or less pasture. Flat. The grass was a little over knee high. Maybe a little taller than that. From here – from the second fence over to the brush pile, though, they had bushhogged it some time or another, but the grass was up.

Nearby was a limb that had blood on the end of it; Detective Ferguson opined that the limb was the murder weapon. Police found hair on the bottom string of the barbed wire fence closest to the brush pile and also found blood under the fence. Additionally, police found the victim's blue cap, a Bic lighter, and an unlit cigar identical to the ones in the victim's van. The next morning, police retrieved a blanket the appellant had used.

Detective Ferguson said that the victim's body was found lying face down behind some logs that were at the front of the brush pile. Detective Ferguson stated that the victim's body had "some vegetation over the head and chest area." He said, "You could see what

looked like blood, multiple – could not recognize the body is what it amounted to. . . . We rolled him over and still could not recognize him. It looked like he had been beat several times in the head." Detective Ferguson stated that no personal property was found on the victim. The police were never able to recover the victim's wallet.

Detective Ferguson said that he believed the victim was hit first at or near the barbed wire fence and that he was killed behind the logs in the brush pile. He stated that with the victim's injuries, he expected to find a large pool of blood. Detective Ferguson found around the victim an area of blood that was "a little over a foot wide. It looked like it had soaked in the ground where his face was laying." Detective Ferguson acknowledged that nothing was found at the scene that was connected to the appellant.

Chief Medical Examiner Bruce Levy's autopsy report stated that the victim's death was a result of blunt force head injuries.[2] The victim had multiple superficial injuries to his face and scalp. Two lacerations to the scalp measured greater than four inches. On the right side of the victim's forehead was a three inch by two inch "blunt force complex," within which were three lacerations measuring between one and a quarter inch to half an inch. Dr. Levy also noted contusions and edema around the victim's eyes, subgaleal and subdural hemorrhage, and fractures to the nasal cartilage and bone. The victim also suffered abrasions to the abdomen, left arm, both hands, and both legs. The autopsy revealed that a minimum of six blows were inflicted on the victim, which were consistent with being struck by a limb or some other cylindrical object.

Shana Mills, a forensic scientist with Bode Technology (Bode) in Martin, Virginia, testified that she was a serologist who tested items for bodily fluids. In the instant case, she received from the Tennessee Bureau of Investigation (TBI) items of evidence to test for blood. The items included hairs from a possible suspect, hairs from a possible victim, blood from under a fence, a blanket, blue jeans, a tree limb, and a blood sample from a suspect. She found two potential spots of blood on the blanket. Mills then submitted the evidence to Sarah Shields, another Bode employee, for DNA analysis. Thereafter, the evidence was sent to the TBI crime laboratory. TBI forensic scientist Mike Turbeville testified that testing revealed that the victim's DNA profile matched the DNA profile generated by Bode from the evidence submitted, namely hair, blood found under a fence, a blanket, and a tree limb.

Lawrence County Sheriff's Deputy Brian Thomason testified that as he drove to work on June 9, 2006, he saw a maroon and tan van on the side of Highway 64. Late the next day, Deputy Thomason was sent to Brent Olive's residence to arrest the appellant. Upon Deputy Thomason's arrival at the residence, he saw two people, one of whom was the appellant, in

---

[2] Dr. Levy's testimony was not transcribed due to technical problems. However, the substance of his testimony was provided in a statement of the evidence produced by the appellant.

the backyard. When the appellant saw the officers, he "took off" running. The appellant ignored Deputy Thomason's repeated instructions to stop. He ran seventy-five to one hundred yards and crossed the creek where he was apprehended by other officers. Deputy Thomason said he did not see the appellant throw anything as he ran, but he explained that it was dark.

Lawrence County Sheriff's Deputy Willie Norwood testified that he was with the team that arrested the appellant at a residence on Hurricane Creek in Wayne County. He saw the appellant run across the creek before being apprehended. He did not see the appellant drop anything, but he explained that it was dark.

Maury County Sheriff's Deputy Sherry Johnson testified that she booked the appellant into jail on the morning of July 11, 2006. The appellant insisted that he needed to use the telephone, "saying he had to get in touch with his son." Between 7:00 and 10:30 a.m., the appellant made several telephone calls, none of which were to his son. As was standard procedure, the calls were recorded. After hearing the appellant's side of the conversations, Deputy Johnson contacted the Lawrence County Sheriff's Department to see if the telephone calls would be useful to the investigation.

Richie Hickman testified that he made a copy of telephone calls the appellant made while he was in jail. A recording of the telephone calls was played for the jury. In the conversation, the appellant asked Kelly Jones to find a cloth "little white bag" he threw in the weeds "when [he] took off running from them at the creek." He told Kelly Jones that the bag was "full of pills and full of cocaine and old coins and everything."

Detective Ferguson testified that after he heard the recordings of the appellant's conversations, he and Investigator Charlie Carlton went to the creek where the appellant was arrested. However, they were unable to find the bag described by the appellant.

The appellant testified that he had prior convictions of forgery, theft, evading arrest, and being an habitual motor vehicle offender. He recalled that on June 9, 2006, he, Hammack, and Battles were going to a pawn shop in Lawrenceburg when they saw Heath and the victim parked on the side of the road with car trouble. The appellant said that because Hammack and Battles knew the men, they stopped to help. They learned that Heath and the victim could not change the van's flat tire because they did not have the right lug wrench. The appellant stayed with the victim while Heath, Battles, and Hammack went to Self's Market to borrow a wrench. The appellant said he tried to help the victim change the tire, but the wrench the victim was using slipped and "smashed" his hand. Eventually, they quit trying to change the tire. A white car pulled over, but the appellant could not tell who was inside. The victim got into the car. He told the appellant to tell Heath that he was going to Waynesboro. The appellant said that the car went toward Lawrenceburg and that was the

last time he saw the victim. He said that Heath, Battles, and Hammack's trip to the market took about twenty minutes. He explained that he was sweating and panting when they returned because he had been "jogging up and down the road . . . [for no] particular reason." He acknowledged that it was "very hot" that day, approximately ninety-five degrees. He said that he wiped off with the blanket.

The appellant denied that he killed the victim. He acknowledged that he and Hammack talked about being "broke." He said that Hammack was "broke" but that the appellant had twenty or thirty dollars. The appellant explained that he told Kelly Jones to get the bag he had thrown beside the creek because he had put cocaine and pills in it. He denied telling her to get the bag because of the old coins. He said that he got the old coins from a friend's house, not from the victim.

Based upon the foregoing proof, the jury found the appellant guilty of first degree premeditated murder and especially aggravated robbery. The trial court imposed a sentence of life for the murder conviction and an agreed, concurrent sentence of twenty-two years for the especially aggravated robbery conviction. On appeal, the appellant raises the following issues for review:

> 1. Whether the evidence is sufficient to support the appellant's convictions;
>
> 2. Whether the trial court erred in refusing to grant a mistrial after a detective testified that the appellant exercised his right to remain silent and refused to give police a statement;
>
> 3. Whether the trial court erred in admitting, or in the alternative not redacting, an audio tape recording of telephone calls the appellant made while in jail;
>
> 4. Whether the trial court erred by instructing the jury on flight and attempting to conceal or suppress evidence;
>
> 5. Whether the court reporter's failure to provide a complete transcript denied the appellant a full and complete appellate review; and
>
> 6. Whether the cumulative errors require a new trial.

## II. Analysis

A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

To sustain the appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Additionally, this court has suggested that facts concerning the prior relationship between the appellant and the victim from which motive could be inferred is indicative of premeditation. See State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993).

Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(1) and (2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft

-9-

of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

The appellant argues that his convictions are based solely upon circumstantial evidence and that, as such, "the facts and circumstances must be so strong and cogent as to exclude every other reasonable hypothesis except that the [appellant] is guilty." Tennessee law clearly provides that a guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Previous case law provided that a guilty verdict resulting from purely circumstantial evidence must be supported by facts that would "exclude every other reasonable hypothesis save the guilt of the [appellant]." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). However, our supreme court recently clarified that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of the evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). Therefore, the State was not required to exclude every hypothesis except the appellant's guilt.

In the light most favorable to the State, the evidence adduced at trial reveals that the appellant complained earlier in the day that he did not have any money. The appellant was acting strangely and appeared to be on drugs. When Hammack and Battles stopped to help Heath and the victim, the appellant "insisted" that he would stay with the victim while the others went to Self's Market. When they returned, the appellant was panting and drenched in sweat. The appellant wiped himself off with a blanket. Later, the victim's blood was found on the blanket. The appellant told Heath that the victim got into a white car and left for Waynesboro. The next day the victim's body was found lying face down in a brush pile near where the van had been parked the previous day. The appellant wanted to leave the scene after he saw a patrol car. Hammack and Battles testified that later that night the appellant expressed concern that the "law" would be called and asked to be driven to a friend's home. The autopsy revealed that the victim died as a result of multiple blows from a cylindrical object, such as a tree limb. Testing on the tree limb found near the victim's body revealed the presence of the victim's blood. After the appellant was arrested, he called Kelly Jones and asked her to retrieve a bag containing "old coins" that he had thrown by the creek where he was arrested. Heath testified that the victim habitually carried "old coins" in his wallet, which was never recovered. We conclude that from the foregoing, the jury could reasonably infer that the appellant saw an opportunity to rob the victim. When the appellant and the victim were alone, the appellant took a nearby tree limb and repeatedly beat the victim. After the victim's death, the appellant took the victim's wallet, which contained old coins, from the victim's back pocket. When Heath returned, the appellant concocted a story to explain the victim's absence. Later, he asked someone to find and conceal a bag containing his ill-gotten goods. Therefore, we conclude that the evidence is sufficient to

-10-

sustain the appellant's convictions for first degree premeditated murder and especially aggravated robbery.

## B. Mistrial

The appellant argues that the trial court erred in failing to grant a mistrial after Detective Ferguson testified that the appellant, after being informed of his <u>Miranda</u> rights, exercised his right to remain silent. The record reveals that During Detective Ferguson's testimony, the State asked the detective about his "interview process." Detective Ferguson said that several people were "rounded up" and brought to the jail for interviews. Detective Ferguson continued his testimony, stating that the appellant "was brought back later on that night. He didn't want to talk to me. After he was read his rights and claimed, he didn't want to talk . . . ." At that point, defense counsel requested a jury-out hearing.

After the jury exited the courtroom, defense counsel asked for a mistrial based upon Detective Ferguson's statement that the appellant did not want to talk. The trial court noted that Detective Ferguson was an "experienced officer [who] should know not to mention that the [appellant] exercised his Fifth Amendment rights." The State contended that the answer given "was not necessarily responsive" to the question asked by the State and could be cured by an instruction to the jury. Defense counsel responded, "An instruction simply highlights the matter, Your Honor." The trial court agreed and acknowledged that "a curative instruction just emphasizes what might not have been noticed all that much."

The trial court denied the appellant's motion for a mistrial. The trial court stated, "I'll let the [appellant] help me decide whether to give a curative instruction or to just proceed on." Defense counsel said, "That would be up to Your Honor. I feel at this stage, we can't take part in whatever the Court does." The court did not give a curative instruction.

On appeal, the appellant acknowledges that case law establishes that commentary regarding a defendant's exercise of his right to remain silent does not always warrant a mistrial. However, he contends that the case law cited by the State was based "upon such findings as a failure to object, curative instructions given by the judge, or strength of the state's case. In this case, immediate request for mistrial was requested, no curative instructions [were] given, and sufficiency of the convicting evidence is being attacked by the [appellant]." In response, the State contends that although Detective Ferguson should not have alluded to the appellant's invocation of his right to remain silent, the testimony was not solicited by the State and the State made no further mention of the appellant's assertion of his right to remain silent. The State also notes that the appellant did not request a curative instruction and, in fact, argued against such an instruction.

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998). Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution generally provide a privilege against self-incrimination to individuals accused of criminal activity, which includes a right to remain silent. Case law clearly establishes that a defendant may not be punished at trial for exercising his constitutional right to remain silent after arrest. See Doyle v. Ohio, 426 U.S. 610, 618 (1976); Braden v. State, 534 S.W.2d 657, 660 (Tenn. 1976). Therefore, the prosecution generally may not comment at trial regarding a defendant's invocation of his right to remain silent. See Braden, 534 S.W.2d at 660; State v. Marlin C. Goff, No. E2005-02090-CCA-R3-CD, 2006 WL 2633008, at *10 (Tenn. Crim. App. at Knoxville, Sept. 14, 2006). Regardless, a comment regarding the invocation of the right to remain silent may be considered a harmless error that does not require the grant of a mistrial. See Honeycutt v. State, 544 S.W.2d 912, 917-18 (Tenn. Crim. App. 1976); State v. Deangelo Davis, No. W2008-00992-CCA-R3-CD, 2009 WL 1841725, at *5 (Tenn. Crim. App. at Jackson, June 26, 2009), perm. to appeal denied, (Tenn. 2009).

We agree with the trial court that Detective Ferguson should not have commented about the appellant's invocation of his right to remain silent. However, as the trial court noted, Detective Ferguson's testimony was not deliberately elicited by the State. Further, as the State maintains, the prosecution made no further reference to the contested statement.

Regarding the trial court's failure to give a curative instruction, the record reflects that defense counsel did not request a curative instruction, even when specifically given the opportunity by the trial court. Further, defense counsel told the trial court that a curative instruction "simply highlights the matter." Generally, "[a] defense counsel's failure to request a curative instruction is a failure to take action 'reasonably available to prevent or nullify the harmful effect of an error.'" Davis, No. W2008-00992-CCA-R3-CD, 2009 WL 1841725, at *5 (quoting Tenn. R. App. P. 36(a)). Based upon the foregoing, we conclude that the trial court did not err in refusing to grant the appellant's motion for mistrial.

C. Admission of Jail Telephone Calls

-12-

The appellant argues that the trial court erred in allowing the State to play for the jury recordings of telephone calls the appellant made from jail or, in the alternative, in failing to have the recordings redacted. To this end, the appellant maintains that he objected to the admission of the conversations based upon relevance, noting that the bag and its contents were never found by police. The appellant further maintains that even if relevant, the prejudicial effect of the conversations "far outweighed any probative value." The appellant also argues that the conversations contained "hearsay and hearsay within hearsay."

## 1. Relevance

Generally, to be admissible evidence must be relevant to some issue at trial. See Tenn. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). "Under this standard, we will not reverse unless the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (internal quotations and citations omitted).

The appellant argues that neither "the bag nor its contents were ever recovered." Further, he contends that "the time of the throwing [was not] established." The recording contains the following statements:

> Kelly [Jones]: . . . I'm gonna go look again but I bet you somebody got it.
>
> [The appellant]: Well, its up in there, it's up, up in there where you, where when I took off running from them at the creek?
>
> . . . .
>
> [The appellant]: Went up toward the trailer and I just threw it in the highest weeds.

-13-

The trial court stated that "the evidence is very relevant. I think it's a question of fact for the jury as to whether . . . what the [appellant] was trying to have located and brought to him was related to this particular crime or not." On appeal, the State contends that the appellant's "statement that he had attempted to conceal several 'old coins' from the police as they came to arrest him made his removal of these coins from the victim[] more probable than it would be without that evidence." We agree with the State and the trial court. The appellant admitted to Kelly Jones that as he was pursued by police, he threw away a bag containing drugs and old coins. The proof reflected that the victim had old coins in his possession at the time of the murder. Therefore, we conclude that the recording, at least concerning the appellant's desire to recover the bag he threw by the creek, is relevant and admissible.

## 2. Hearsay

Turning to the appellant's contention that the recording contains hearsay, we note that hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible during a trial unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802. The State contended, and the trial court agreed, that the statements made by Kelly Jones were not hearsay as they were not made for the truth of the matter asserted but rather to provide context for the appellant's statements.

We conclude that the appellant's statements were hearsay. However, Tennessee Rule of Evidence 803(1.2)(A) provides, in pertinent part, that the hearsay rule does not exclude a party's own statement which is offered against that party. "This means that any assertion a party spoke, wrote, or did may be used against that party as an admission." Neil P. Cohen et al., Tennessee Law of Evidence §8.06[3][a] (LEXIS publishing, 5th ed. 2005) (footnotes omitted). Further, "the admission need not be inculpatory, against interest, or even contrary to the trial position of the party who made it. If the opponent wants to use it, the statement comes in as evidence." Id. (footnotes omitted); see also State v. Lewis, 235 S.W.3d 136, 145 (Tenn. 2007). Therefore, we conclude that the appellant's statements on the tape were admissible as admissions by a party opponent.

We note that the transcript of the conversation consisted of eighteen pages, all of which was admitted at trial. The transcript reveals that the bulk of the conversation concerned the appellant's obtaining telephone numbers of people he wanted to call, asking for individuals to come to court for him, or generally discussing personal matters. These statements are of questionable relevance and therefore arguably should have been redacted. The appellant specifically contends that "the references to attempts to warn the [appellant,] . . . accusations of guilt by unknown parties[,] . . . threats of drugs charges on acquaintances

-14-

of the [appellant,] . . . and uncharged crimes and bad acts" were particularly prejudicial. We disagree. The threats of arrest on drug charges purportedly made to the appellant's girlfriend, which allegations she maintained were unfounded, did not prejudice the appellant. The discussions regarding accusations of the appellant's guilt which were made by third parties simply referred to the instant murder charges; the jury, obviously, was already aware of the murder charges. Additionally, the statements about the drugs in the bag were actually used by the appellant to explain his desire to have the bag retrieved and thus were not overly prejudicial to the appellant. Given the foregoing, we conclude that any error in not redacting the conversations did not "'affirmatively appear to have affected the result of the trial on the merits.'" State v. Dotson, 254 S.W.3d 378, 388 (Tenn. 2008) (quoting Tenn. R. Crim. P. 52(a)); see also Tenn. R. App. P. 36(b).

## D. Jury Instructions

The appellant contends that the trial court erred by instructing the jury, over the appellant's objection, regarding flight and attempting to conceal or suppress evidence. The appellant maintains that there was no evidence of flight or of an attempt to conceal evidence.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Moreover, we have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

### 1. Flight

The trial court substantially followed Tennessee Pattern Jury Instruction 42.18 on flight and charged the jury as follows:

> The flight of a person accused of a crime is a circumstance which, when considered with all of the facts of the case, may justify an inference of guilt.
>
> Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves, beyond a reasonable doubt, that the defendant fled is a question for your determination.

-15-

The law makes no precise distinction as to the manner or method of flight. It may be open or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty, and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of a crime alleged; however, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant.

On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it are all questions for you to determine.

In order to instruct the jury on flight, sufficient evidence must exist to support the instruction. State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). Our supreme court has explained that

The fact that a defendant after the commission of a crime concealed himself or fled from the vicinity where the crime was committed, with knowledge that he was likely to be arrested for the crime or charged with its commission, may be shown as a circumstance tending to indicate guilt.

. . . .

The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the

-16-

scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

State v. Dorantes, 331 S.W.3d 370, 388 n. 16 (Tenn. 2011) (internal quotations and citations omitted). Sufficient evidence requires "a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community." State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989). Moreover, this court has stated that

the flight instruction pointed out to the jury that innocent persons may take flight, and it was up to the jury to determine whether there was flight, the reasons for the flight, and the weight to be given to it. Just as the instruction allowed an inference of guilt from flight, it also instructed that the evidence, facts, and circumstances may show that an innocent person may take flight.

State v. Richardson, 995 S.W.2d 119, 129 (Tenn. Crim. App. 1998).

In the instant case, Heath testified that the appellant asked to leave the scene right after seeing a police car pass by. Battles and Hammack stated that the appellant did not want to stay at Hammack's residence for fear Hammack's father would call police. Additionally, when police discovered the appellant in a friend's backyard, the appellant ran from police. We conclude that the foregoing evidence sufficiently establishes "both a 'leaving of the scene' and a subsequent evasion." State v. Kevin McDougle, No. W2007-01877-CCA-R3-CD, 2010 WL 2219591, at **6-7 (Tenn. Crim. App. at Jackson, May 24, 2010). Therefore, we conclude the trial court did not err in instructing the jury on flight.

2. Attempting to Conceal or Suppress Evidence

The appellant also contends that the trial court erred in instructing the jury about the appellant attempting to conceal or suppress evidence. The trial court instructed the jury as follows:

Any attempt by an accused to conceal or destroy evidence, including any attempt to suppress the testimony of a witness, is relevant as a circumstance from which the guilt of the accused may be inferred.

Whether the evidence presented proves that the defendant attempted to conceal or suppress evidence is a question for your determination.

If attempted concealment or suppression of evidence is proved, that fact alone does not allow you to find that the defendant is guilty of the crime alleged, however since attempted concealment or suppression of evidence by a defendant may be caused by a consciousness of guilt[], you may consider such fact if proven, together with all of the other evidence, when you decide the guilt or innocence of the defendant.

On the other hand, such evidence of attempted concealment or suppression of evidence may be explained by the proof offered or by the facts and circumstances of the case.

Whether there was an attempted concealment or suppression of evidence by the defendant, the reasons for it, and the weight to be given to it are questions for you to determine.

The appellant argues that "this instruction was improper due to the lack of any evidence being concealed or suppressed." He maintains that the State's argument that the appellant threw away a bag which contained old coins he obtained by robbing the victim "was theory only, which cannot substantiate a jury instruction." The appellant asserts that the instruction "improperly communicated to the jury that they could infer the guilt of [the appellant]."

This court has previously explained that "[a]ny attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred." Tillery v. State, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978). To this end, our supreme court has agreed that "the concealment of evidence may be relevant to guilt." State v. West, 844 S.W.2d 144, 151 (Tenn. 1992). Therefore, "[p]ost-crime concealment of evidence has continued to be an acceptable inference suggesting that a defendant has committed some crime." State v. Joseph Lee Bernell Bryant, No. 01C01-9705-CR-00194,1998 WL 301722, at *6 (Tenn. Crim. App. at Nashville, June 10, 1998).

In the instant case, the proof of concealment came from the appellant's own words. He telephoned Kelly Jones and asked her to retrieve a bag he tossed by the creek when police came to arrest him. The appellant said the bag contained, among other items, old coins.

Heath testified that the victim habitually carried old coins in his wallet. The victim's wallet was missing when his body was discovered. We conclude that this evidence sufficiently raises the issue of concealment of evidence to warrant the instruction given by the trial court. See West, 844 S.W.2d at 150-51; State v. Randall Scott, No. M2001-02911-CCA-R3-CD, 2003 WL 22438523, at *6 (Tenn. Crim. App. at Nashville, Oct. 28, 2003).

## E. Incomplete Transcript

The appellant contends that he was denied his right to full and complete appellate review because the court reporter failed to prepare a complete transcript of his trial. At the motion for new trial, the court reporter, James Hobby, testified that, pursuant to his standard procedure, he recorded the trial proceedings on a shorthand machine and, as a backup, on an audiotape. Hobby acknowledged that when he was transcribing the trial, the entire testimony of Bode employee Sarah Shields and medical examiner Dr. Bruce Levy, as well as a portion of the testimony of Richie Hickman, were missing. Shields, who performed a portion of the DNA testing, had prepared a report about the results of her testing which was submitted as an exhibit. Dr. Levy's autopsy report was likewise a trial exhibit. Hickman made a copy of the appellant's jail telephone calls.

Hobby explained that he normally transfers the file containing trial testimony from his shorthand machine to a floppy disk. He then transfers the file from the floppy disk to a computer. Hobby stated that in this case, after the file was transferred onto his computer, a power surge "knocked the hard disk out of that computer." Because of the power surge, the trial testimony was lost. He explained that the file containing the trial testimony had already been erased from the floppy disk and that he had already placed the "shorthand paper" produced by his shorthand machine in the trash. Hobby said that he compiled the trial transcript from the audiotape recordings. However, the testimony of Shields, Dr. Levy, and part of the testimony of Hickman had not been recorded onto audiotape. Hobby surmised that because the missing testimony occurred immediately after a recess, he "dashed in" and "failed to press the [record] button hard enough or in the right place to get it started when we came back from recess."

Hobby said he spent hours trying to find the missing testimony. Nevertheless, he could not explain why it took him almost two years to compile the transcript. He stated it could have been during a period when he was sick. He said that because of his illness, he "had gaps where [he did not] remember things at all." He stated that he had been taking medication because of a neurological problem which "conflicted" with his cholesterol medication and that he was retiring because of the medical condition.

Defense counsel argued that the absence of a complete trial transcript prevented him from preparing an adequate record for review and that he was entitled to a new trial. He

contended that he was unable to prepare a sufficient statement of the evidence. He explained that his trial notes contained the witnesses' direct examination testimony but not their responses to his cross-examination. The State argued that the testimonies of Shields and Dr. Levy were essentially encapsulated in their respective reports and could be detailed accurately in a statement of evidence. Additionally, the State maintained that the information Shields testified to was also covered during TBI Agent Mike Turbeville's testimony. Moreover, the State contended that Hickman's missing testimony occurred "when he first took the stand and [stated] who he was, what he was, where he worked and that kind of thing."

The trial court found that defense counsel, the State, and the court could work together to provide a statement of evidence sufficient to supplement the record with the missing testimony. The appellant then prepared a statement of evidence but attached an affidavit alleging that the "statement is by no means a fair, accurate and complete account of the testimony of the missing witnesses." However, the trial court certified the statement of evidence as accurate.

On appeal, the appellant asserts that the statement of evidence is not a fair, accurate and complete account of the testimony of the missing witnesses and that therefore the appellant's due process rights were infringed.

The Rules of Appellate Procedure provide a remedy for a situation such as this one. Rule 24 provides:

> (c) Statement of the Evidence When No Report, Recital, or Transcript Is Available. If no stenographic report, substantially verbatim recital or transcript of the evidence or proceedings is available, the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. The statement, certified by the appellant or the appellant's counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 60 days after filing the notice of appeal. . . .
>
> . . . .
>
> (f) Approval of the Record by Trial Judge or Chancellor. The trial judge shall approve the transcript or statement of the

evidence and shall authenticate the exhibits as soon as practicable after the filing thereof . . . .

Tenn. R. App. P. 24(c) and (f).

In its order approving the statement of evidence, the trial court stated:

> The undersigned judge recognizes that the attached affidavit of [defense counsel] indicates that he cannot certify the completeness of his Statement of Evidence because his notes during his cross-examination of state's witnesses are not complete, but the undersigned judge believes that the appellant's Statement of Evidence, when considered with the written reports of Sarah Shields and Bruce Levy, is sufficiently fair, accurate, and complete for Rule 24 purposes for adequate appellate review without a verbatim transcript of that portion of the trial testimony.

As Rule 24(c) provides, "the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection." In the instant case, defense counsel, using the best available means, compiled a statement of the evidence which was approved by the trial court. The appellant has not shown how he was prejudiced by having to compile a statement of evidence. Upon our review, we conclude that this statement of the evidence was sufficient for our review of the issues. Therefore, we conclude that the appellant's due process rights were not infringed. This issue is without merit.

### F. Cumulative Errors

Finally, the appellant contends that the cumulative effect of the errors in this case deprived him of his rights to a fair trial and due process. However, we conclude this claim has no merit.

### III.  Conclusion

In sum, we conclude that sufficient evidence supports the appellant's convictions. Additionally, we conclude that the trial court did not err in refusing to grant a mistrial, in instructing the jury, or in admitting the recording of the appellant's jail telephone calls. We also conclude that the court reporter's failure to provide a complete transcript did not deny the appellant a full and complete appellate review. Further, we conclude that any error in failing to redact portions of the recorded telephone calls was harmless. Finally, we conclude

-21-

that the appellant is not entitled to a new trial because of cumulative error.  Therefore, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE